UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 21-20875-CIV-SCOLA/GOODMAN

BLUESTAREXPO, INC.,

      Plaintiff,

v.

JAY ENIS, et al.,

      Defendants.

_____/

**REPORT AND RECOMMENDATIONS ON PLAINTIFF'S MOTION FOR
SANCTIONS AGAINST DEFENDANT SOLEIL CHARTERED BANK**

      Plaintiff BluestarExpo, Inc. ("Bluestar" or "Plaintiff') filed the instant motion

seeking sanctions against Defendant Soleil[1] Chartered Bank ("Soleil" or "SCB") for

discovery violations. [ECF No. 85]. United States District Judge Robert N. Scola, Jr.

referred Plaintiff's motion to the Undersigned "for either an order or a report and

recommendations, consistent with 28 U.S.C. § 636(b)(1), Federal Rule of Civil Procedure

72, and Rule 1 of the Local Magistrate Judge Rules." [ECF No. 86].

---

[1]    Plaintiff's motion and its second amended complaint spell the defendant bank's name as "Soliel." In this Report and Recommendations, the Undersigned will use the spelling "Soleil," as used in the bank's filings.

The Undersigned has reviewed Plaintiff's motion, SCB's response in opposition [ECF No. 93], Plaintiff's reply [ECF No. 94], and the other relevant portions of the record and held a Zoom videoconference hearing on May 10, 2022.

For the reasons given below, the Undersigned respectfully **recommends** that the District Court **grant in part and deny in part** Plaintiff's sanctions motion. The Court should **strike** Soleil's pleadings and **grant as to entitlement** Plaintiff's fees request pursuant to Rule 37(b)(2)(C).

## I.    BACKGROUND

### A.    Plaintiff's Claims

Bluestar filed the instant action against Jay L. Enis ("Enis"), R & T Pharmacy Corp. ("R&T"), The Enis Family Trust ("The Trust"), SCB, Govind Srivastav ("Srivastav"), and Syed Ali Abbas ("Abbas"), alleging that it incurred losses of $300,000 in payments and $35 million in lost profits. [ECF No. 33].

The factual allegations underlying Plaintiff's lawsuit were summarized by Judge Scola in his Order granting in part and denying in part Defendants' motion to dismiss:[2]

> Several months into the COVID-19 pandemic, Bluestar began negotiating a deal involving the purchase and immediate resale of thirty-million boxes of powder-free nitrile examination gloves. (Compl. ¶¶ 11.) To that end, Bluestar intended to purchase the gloves from Wish Paradise Corp., for $285 million, and then resell them, upon receipt, to a buyer that Bluestar

---

[2]    The Undersigned includes this summary of the factual allegations in the second amended complaint for the sole purpose of providing context to the recommendations contained in this Report. The Undersigned makes *no* factual findings as to any allegations in the operative complaint.

had already secured. (*Id.*) The expected profit on the deal was $70 million. (*Id.*)

**Part of Bluestar's agreement with Wish involved Bluestar's providing Wish "with a 'bank confirmation letter,' also known as a 'comfort letter,' from a reputable banking institution,"** "[t]o ensure payment of the multi-million-dollar transaction." (*Id.* ¶ 12.) **The letter had to confirm "that at least $250,000,000.00 in liquid cash was available to facilitate the transaction," before Wish would move forward with the transaction**. (*Id.* ¶¶ 12–13.) In its quest to procure such a letter, Bluestar contacted Enis. (*Id.* ¶ 13.) Enis told Bluestar that his company, R&T, was financially able to provide the funds for the transaction and, therefore, was in a position of being able to secure the comfort letter required by Wish. (*Id.*)

Bluestar and Enis agreed that they would split the profits on the sale of the gloves, evenly, to compensate Enis for his role in the transaction. (*Id.*) Enis also assured Bluestar that the comfort letter would be from a highly reputable bank. (*Id.*) **On July 28, 2020, Enis provided Bluestar with what he said was a comfort letter from Soleil**. (*Id.* ¶ 14.) The letter was signed by Srivastava, as the managing director of Soleil, and Abbas, as the director of an entity called "MENA Trade Finance." (*Id.*) **The letter represented that R&T had "cash funds and/or credit line in the amount of USD 250,000,000.00."** (*Id.*) Contrary to the representations in the letter, however, Enis did not have $250 million in cash funds or a valid credit line, **nor did Soleil have $250 million available through which it could extend credit to R&T. (*Id.* ¶¶ 14, 18) According to Bluestar, Soleil provided the fabricated letter simply to prop up Enis's misrepresentation to Bluestar that R&T had access to the funds Enis said it did.** (*Id.* ¶¶ 14, 18.)

At some point during the parties' discussions, Enis told Bluestar that Soleil would charge a fee of .25% for R&T to transfer $250 million to Soleil to then consummate the transaction with Wish. (*Id.* ¶ 15.) Enis said the fee would amount to about $625,000 but that he would split it, with Bluestar's covering $300,000 of the fee. (*Id.*) Enis and R&T also promised Bluestar that the $300,000 would go towards paying Soleil for the comfort letter. (*Id.* ¶ 19.) On July 28, the same day the comfort letter was provided, Enis emailed a Bluestar officer, providing wire instructions for Bluestar to send the $300,000 to the Trust. (*Id.* ¶ 16.) Enis advised that he had already paid his share of the fee in order to procure the comfort letter. (*Id.*)

3

Less than a week later, on August 2, Bluestar and Wish executed the contract under which Wish would provide the thirty-million boxes of gloves for a total purchase price of $285 million. (*Id.* ¶ 11.) **To comply with the comfort letter requirement, Bluestar presented the letter from Soleil, to Wish, confirming R&T's access to $250 million. (*Id.* ¶ 17.) Wish, apparently aware of "Soleil's dishonorable reputation" and that "Soleil is a fraudulent institution," known to provide "fraudulent letters of credit and comfort letter[s]," and known to be "subject to many lawsuits alleging similar fraudulent misconduct," did not accept the letter. (*Id.*) In fact, says Bluestar, although Soleil purports to be a banking institution, organized under the laws of the Union of Comoros, in reality, it "does not offer any true banking services," instead operating only to "provide[ ] its clients with fraudulent letters of credit and comfort letters" that falsely claim "their clients have funds or credit which they do not possess." (*Id.*)** Indeed, "Soleil currently has multiple lawsuits filed against it in the past year that all claim that . . . Soleil refused to honor its letter of credit after various parties using Soleil's letter[s] defaulted." (*Id.*)

After the deal with Wish fell through, Bluestar demanded the repayment of its $300,000. (*Id.* ¶ 18.) In response, Enis said that the $300,000 had already been paid to Soleil for the anticipated Wish transaction. (*Id.*) Enis could not, however, provide any proof that any funds had ever been actually transferred to Soleil or that Enis had ever handed over any of the $300,000 to Soleil. (*Id.*) Indeed, Bluestar says Enis and R&T kept the $300,000 for themselves and never transferred the $250 million to Soleil. (*Id.* ¶ 19.)

From the beginning, Enis and R&T knew that Soleil was a discredited banking institution and that the comfort letter would not be afforded any credibility. (*Id.* 23.) Bluestar now seeks to hold all six Defendants responsible for the $300,000 payment to the Trust as well as the millions of dollars of profits lost when the deal with Wish collapsed.

*BluestarExpo, Inc. v. Enis*, No. 21-20875-CIV, 2021 WL 4949249, at *1–3 (S.D. Fla. Oct. 25, 2021) (emphasis added).

As modified by Judge Scola's Order, the following claims remain: fraudulent misrepresentation (Count I) against Srivastava, Abbas, and Soleil; negligent

misrepresentation (Count II) against Soleil; civil theft (Count IV) against The Trust; unjust enrichment (Count VII) against The Trust; breach of contract (Count VIII) against Enis and R&T; civil conspiracy (Count XI) against all Defendants; negligent retention (Count XV) against Soleil; violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201, et seq. (Count XVI) against Soleil, Enis, and R&T; and false information negligently supplied (Count XVII) against Soleil. *Id.*

Bluestar now seeks an Order striking SCB's pleadings as a sanction for SCB's intentional failure to comply with the Court's discovery Orders.

**B.    Discovery Disputes Between Plaintiff and SCB**

**1.    January 6, 2022 Discovery Hearing**

On January 6, 2022, the Undersigned held a Zoom videoconference hearing on the parties' discovery disputes. Plaintiff sought, in part, to compel better responses from Soleil to its First Request for Production. Following the hearing, the Undersigned issued a Post-Discovery Hearing Administrative Order which, *inter alia*, required Soleil to provide amended responses to Requests for Production Nos. 5 through 14, and overruled Soleil's objections (including general objections) to this discovery. [ECF No. 62].

The Undersigned ordered Soleil to produce "[a]ny and all documents in [its] possession, custody, or control, which reflect[ed] [Soleil's] financial ability to extend $285,000,000.00 in credit in July 2020," any and all documents reflecting Soleil's assets,

profit and loss statements, balance sheets, independent audit reports, cash flow statements, and tax returns for the years 2018, 2019, and 2020. *Id.*

The Undersigned also imposed a Rule 37 fee-shifting award of $1,000.00, apportioned evenly between Soleil and its counsel. *Id.*

### 2. February 10, 2022 Discovery Hearing

The Undersigned held a second discovery hearing on February 10, 2022. Plaintiff again sought to compel Soleil to provide better responses to Plaintiff's First Request for Production. Plaintiff also sought to compel Soleil to provide supplemental answers to its First Set of Interrogatories and asked for monetary sanctions or an adverse inference.

Following the hearing, the Undersigned issued a Post-Discovery Hearing Administrative Order which required Soleil to "produce all documents responsive to Requests for Production Nos. 8, 9, 10, 11, 12, 13, and 14" and specifically stated that:

> In order to provide full, comprehensive responses to these requests for production, **[Soleil] will need to obtain documents from the Trustee (of the Trust which purportedly owns the bank)**. The Court suggests that the request(s) for documents be made in writing because **if the documents are not produced, then the Court intends to look further into this matter**.

[ECF No. 67, pp. 1-2 (emphasis added)].

The Order required Soleil to also provide supplemental answers to Interrogatories Nos. 1, 2, 5 through 7, 9, 15 through 18, 20 and 21. *Id.* at 2. With respect to Interrogatories Nos. 5 through 7, 9 and 15, the Order stated, "**[Soleil] will need to obtain information**

**from the Trustee in order to provide full, comprehensive answers**." *Id.* (emphasis added).

The Undersigned deferred ruling on Bluestar's request for an adverse inference against Soleil, but again imposed a fee-shifting award:

> The Court defers ruling on Plaintiff's request for an adverse inference until [Soleil] has provided (or not provided) its supplemental production and answers. Nonetheless, the Court finds that, under Federal Rule of Civil Procedure 37, a fee-shifting award of $1,000.00 is appropriate because Rule 37 mandates a fee-shifting award in favor of the party who prevailed on a discovery dispute, unless certain inapplicable exceptions apply. Fed. R. Civ. P. 37(a)(5).

*Id.* at 5.

### 3.    March 17, 2022 Discovery Hearing

On March 2, 2022, Plaintiff filed a notice of hearing [ECF No. 73], setting a discovery hearing for March 17, 2022 before the Undersigned. Three of the four topics listed in Plaintiff's notice concerned SCB's continued failure to adequately respond to written discovery:

> 1.    Whether sanctions and an adverse inference should be construed against Soleil Chartered Bank for its continued refusal to provide its financial documentation while claiming that its own financial documents are being held in a Trust in Lichtenstein,[3] specifically Soleil's Third Response to the Plaintiff's First Request for Production . . . Requests: 8, 9, 10, 11, 12, 13, and 14.
>
> 2.    Whether sanctions and an adverse inference should be construed against Soleil Chartered Bank for its continued refusal to provide answers

---

[3]    Liechtenstein is sometimes spelled "Lichtenstein" in some of the documents in the record.

to interrogatories regarding its financial worth and claiming that its [sic] cannot consult its own financial documents since they are being held in a Trust in Lichtenstein, specifically Soleil's Second Response to the Plaintiff's First Set of Interrogatories . . ., responses: 5, 6, 7, 9, 11, 12, and 15.

3.      Whether Soleil's Pleading should be stricken pursuant to its failure to respond to the above referenced Request for Production and Interrogatories.

*Id.* (footnote added).

The Undersigned issued a Paperless Order advising the parties that these three topics would *not* be addressed at the March 17, 2022 discovery hearing because the "topics [were] too complicated to be adequately discussed at a briefing-free hearing" and permitting Plaintiff, if it so wished, to "file a motion for sanctions, with a full-fledged memorandum of law." [ECF No. 75].

The Undersigned proceeded with the March 17, 2022 hearing -- addressing Plaintiff's disputes with another defendant -- and issued a Post-Discovery Hearing Administrative Order. [ECF No. 76].

**C.      Plaintiff's Sanctions Motion**

**1.      Plaintiff's Motion**

Bluestar contends, and SCB does not dispute, that to date, SCB has not produced amended responses to requests for production and supplemental answers to interrogatories as it was ordered to do so in two discovery Orders. [ECF Nos. 62; 67]. The withheld discovery concerns documents and information about SCB's financial condition.

8

SCB maintains that it cannot comply with the Court's Orders due to Liechtenstein's so-called "blocking law." SCB has provided two letters, dated January 10, 2022 and February 15, 2022, from a law firm in Liechtenstein which purportedly represents the Trustee of the Trust Company which supposedly owns SCB. [ECF Nos. 92-5, pp. 26-31; 92-9].[4]

Plaintiff argues that "Lichtenstein's confidentiality law is meaningless as it relates to SCB's responses to discovery since it is SCB's decision to withhold the information" and cites to a portion of one of the two attorney letters which states: "We also point out again that this Art. 21 TrHG constitutes a state-recognized obligation of confidentiality, incumbent upon every Trustee, **insofar as he or she were not to be exempted from it by its client**." [ECF No. 85, p. 9 (emphasis in motion)]. According to Plaintiff, "all SCB's owner has to do is permit the trustee to obey this Court's orders." *Id.* at 11.

Plaintiff further argues that impossibility of compliance is not a defense in the instant case, where SCB *created* the circumstances which purportedly preclude it from complying with the Court's Orders. *Id.* at 14 ("[I]t was . . . SCB who organized itself as the property of a trust domiciled in Lichtenstein, where the Lichtenstein trustee could audaciously claim that the discovery requested was immune from disclosure.").

Plaintiff also asserts it has been prejudiced by SCB's noncompliance:

---

[4]     The contents of these letters (and their impact on Soleil's inability to comply defense) will be addressed in section III.A *infra* of this Report and Recommendations.

> Bluestar is deeply prejudiced by its inability to discern and discover SCB's financial condition, since SCB's actual financial condition is central to its case. If SCB, as Bluestar suspects[,] lacks the financial wherewithal to facilitate a quarter of a million dollar payment to Bluestar's customer, or to extend credit in such a sum to R&T, and has a far lower financial capacity, the Bluestar claim that the "comfort letter" that it paid for was a mere charade, will be clearly demonstrated.

*Id.* at 14-15.

Bluestar asks the Court to impose the most severe sanctions available under Rule 37, "including the striking of [SCB's] pleadings and the entry of a default judgment against it." *Id.* at 10. According to Plaintiff,

> SCB simply determined that it is contumaciously refusing to provide the ordered discovery after having been repeatedly ordered to do so by this Court, after having been sanctioned twice for not doing so and has boldly asserted that, SCB, a bank situated in the State of New York, is prevented from doing so by the laws of Liechtenstein because it is owned by a trust in Liechtenstein where the trustee has refused to turn over the documents because the owners of SCB have withheld permission for the trustee to do so.

*Id*. Plaintiff argues that "[u]nder such circumstances, the only finding which can be made in the face of such audacity, is that SCB's violation is in bad faith and is willful." *Id*.

### 2.    Soleil's Response

Soleil continues to insist that it is unable to comply with the Court's discovery Orders due to Liechtenstein's blocking law. [ECF No. 93, p. 1]. Nonetheless, Soleil

acknowledges that its "objections in relation to Lichtenstein Law [have been] overruled" by the Court and is willing to stipulate to an unspecified adverse inference. *Id.*[5]

According to Soleil, it has not *willfully* refused to produce discovery concerning its financial ability to issue the comfort letter because the documents were "prohibited from being released by foreign law, as confirmed by the letters of the Lichtenstein counsel." *Id.* at 3. In other words, "its proverbial 'hands' [are] tied due to the workings of Lichtenstein Law." *Id.*

Soleil further argues that because Plaintiff has not retained its own attorney to interpret Liechtenstein law, the Court should not consider Plaintiff's proffered reading of the blocking law. *Id.* Soleil also ascribes an improper motive to Plaintiff's decision to file the instant motion. *Id.* ("Plaintiff filed the instant motion, instead of working out a stipulation for an adverse inference, solely to cause SCB to cause [sic] unnecessary cost and expense.").

### 3.     Plaintiff's Reply

In its reply, Plaintiff addresses Soleil's claim that the instant motion was filed for an improper purpose, asserts that it has been Soleil (not Plaintiff) that has caused needless costs and expense, notes that Soleil has yet to propose an actual adverse inference, disputes Soleil's alleged inability to comply with the Orders, and devotes the remainder

---

[5]     The terms of the adverse inferences to which SCB is willing to stipulate were not fleshed out until the May 10, 2022 hearing. *See, infra.*

of its brief to recapping the parties' conferrals (or lack of conferrals) concerning the sanctions motion. [ECF No. 94].

**D.     May 10, 2022 Hearing on Sanctions Motion**

On May 10, 2022, the Undersigned held a Zoom videoconference hearing on the instant motion. At the hearing, the Undersigned proposed the following three adverse inferences:

1.     SCB did not in fact have the cash funds and/or a credit line in the amount of USD 250,000,000.00.

2.     SCB did not engage in the appropriate due diligence to factually support its representations in the comfort letter that the USD 250,000,000.00 were good, clean, cleared, free of any liens and encumbrance of non-criminal origin and from legal sources.

3.     SCB was not a legitimate financial institution.

SCB's counsel represented to the Court that SCB would agree to the first two adverse inferences and to a modified version of the third adverse inference which included a clarification that SCB had a banking license from the Union of Comoros.

Bluestar maintained that these adverse inferences are inadequate and that only the striking of SCB's pleadings would be sufficient given SCB's contumacious conduct.

For the reasons discussed below, the Undersigned agrees with Plaintiff that the adverse inferences are insufficient to remedy SCB's willful discovery violations and that the striking of SCB's pleadings is warranted.

## II.    APPLICABLE LEGAL STANDARD

Federal Rule of Civil Procedure 37(b)(2)(A) provides that when "a party . . . fails to obey an order to permit or provide discovery . . . the court where the action is pending may issue further just orders," including the following:

> (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
>
> (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
>
> (iii) striking pleadings in whole or in part;
>
> (iv) staying further proceedings until the order is obeyed;
>
> (v) dismissing the action or proceeding in whole or in part;
>
> (vi) rendering a default judgment against the disobedient party; or
>
> (vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(A).

"Rule 37 sanctions are intended to prevent unfair prejudice to the litigants and insure the integrity of the discovery process." *Gratton v. Great Am. Commc'ns*, 178 F.3d 1373, 1374 (11th Cir. 1999) (citing *Aztec Steel Co. v. Fla. Steel Corp.*, 691 F.2d 480, 482 (11th Cir.1982)). The Supreme Court has identified the need to punish the offender and a desire to deter similar conduct in future cases as the dual policies justifying the imposition of

severe sanctions for willful discovery violations. *Nat'l Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 643 (1976) (per curiam).

The Court's discretion under Rule 37 is guided by judicial interpretations of the rule. *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1542 (11th Cir. 1993). A district court may only impose a severe sanction listed in Rule 37(b) when it has been established that the party's failure to comply is due to the party's own willfulness, bad faith, or fault. *Nat'l Hockey League*, 427 U.S. at 640; *Societe Internationale v. Rogers*, 357 U.S. 197, 212 (1958). At the same time, mere "negligence, misunderstanding, or inability to comply" is not sufficient to justify the striking of a party's pleadings for noncompliance with a court order. *Malautea*, 987 F.2d at 1542 ("Violation of a discovery order caused by simple negligence, misunderstanding, or inability to comply will not justify a Rule 37 default judgment or dismissal.").

Unlike with lesser sanctions, district courts will impose the severe sanctions listed in Rule 37(b) only upon finding that (1) the party's failure to comply with the order was willful or a result of bad faith, (2) the party seeking sanctions was prejudiced by the violation, and (3) a lesser sanction would fail to adequately punish and be inadequate to ensure compliance with court orders. *See, e.g., Immuno Vital, Inc. v. Telemundo Grp., Inc.*, 203 F.R.D. 561, 571 (S.D. Fla. 2001); *Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 132 (S.D. Fla. 1987).

Once the moving party makes a *prima facie* showing of a discovery violation, the non-movant must show that it was impossible to comply with the relevant court order(s) to avoid sanctions. *In re Chase & Sanborn Corp.*, 872 F.2d 397, 400 (11th Cir. 1989). Nevertheless, the decision to award sanctions is ultimately a judgment call. *See Kale v. Combined Ins. Co.*, 861 F.2d 746, 758 (1st Cir. 1988) (citation omitted) ("[A]t its core imposition of sanctions is a 'judgment call.'"); *FDIC v. Tekfen Constr. & Installation Co.*, 847 F.2d 440, 443 (7th Cir. 1988) (citation omitted) ("Sanctions are ultimately a 'judgment call.'").

## III.    ANALYSIS

As noted above, Bluestar contends, and SCB does not dispute, that to date, SCB has not produced amended responses to requests for production and supplemental answers to interrogatories despite being ordered to do so in two discovery Orders. [ECF Nos. 62; 67]. Thus, Bluestar has satisfied its burden of making a *prima facie* showing that SCB has violated the Court's discovery orders.

The burden now shifts to SCB to prove that it was impossible to comply with the Court's Orders. *In re Chase & Sanborn Corp.*, 872 F.2d 397. For the reasons outlined below, SCB has not met its burden.

A.     **SCB's Impossibility of Compliance Defense and Willful Disregard of this Court's Discovery Orders**

Soleil does not claim its failure to comply with the discovery Orders is due to negligence or a misunderstanding.[6] Soleil's *sole* justification for not complying with the Court's discovery Orders is its claim that it is prohibited from doing so due to Liechtenstein law. [ECF No. 93, p. 3 ("SCB's position [is] that it cannot comply with the [O]rder[s] or it will violate Lichtenstein Law.")].

To support this argument, Soleil relies on letters dated January 10, 2022 and February 15, 2022 from a Liechtenstein law firm purportedly representing the Trustee of the Trust which supposedly owns SCB. [ECF Nos. 92-5, pp. 26-31; 92-9].

The January 10, 2022 letter is titled, "Legal Opinion on Article 21 of the Liechtenstein Law of November 2013 concerning Professional Trustees and Fiduciaries (Trustee Act) (TrHG), LGBL 2013 No. 421 regarding professional secrecy and the Trustee's obligation to confidentiality." [ECF No. 92-5, p. 26]. The letter is addressed to David C. Van Leeuwen, SCB's United States litigation counsel, and states that the opinion

---

[6]     The Undersigned's discovery Orders [ECF Nos. 62; 67] were clear and unambiguous, as evidenced by Liechtenstein counsel's February 15, 2022 letter which listed seven categories of documents/information sought by those discovery Orders. [ECF No. 92-9, p. 1]. In other words, because Soleil's counsel would necessarily have had to convey to the Liechtenstein attorney the documents and information sought by the Court's discovery Orders, it is clear that Soleil's counsel (and therefore, Soleil) understood what documents and information were needed in order to comply with the discovery Orders.

contained therein was prepared at Mr. Van Leeuwen's request. *Id.* ("You have asked us for a legal opinion in respect of the issue as defined below.").

The letter frames the legal issue as follows:

A Liechtenstein Trust Company acting in its capacity as the Trustee of a Trust Settlement ("the Trustee") established under the laws of Liechtenstein has been served with discovery requests and/or a subpoena by a competent United States of America Civil Court to testify in a civil proceeding against a U.S. person, being the Trustee's client ("the Client"), and to produce all documents with regard to the Client, which the court may treat as relevant in the frame of the pending civil court proceedings. **You have requested our opinion of the restrictions, if any, that Liechtenstein law imposed upon the Trustee with reference to the production of documents and to the Trustee's testimony in the pending proceedings against the U.S. Client, requesting the referencing statute or law of Liechtenstein that would govern such production of documents and testimony**.

[ECF No. 92-5, p. 26-27 (emphasis added)].

The letter concludes that:

As a result and with particular regard to a Trustee's obligation to confidentiality pursuant to Art. 21 TrHG, **the Trustee has the duty to maintain the secrecy of all facts entrusted to him in his professional capacity and which have become known to him from the client relationship and is therefore entitled and obliged to make use of this comprehensive right to refuse to testify and provide documents vis-a-vis any third person or authority, administration, court or government, among them vis-a-vis civil courts in pending civil proceedings**, but not - given the precise wording of Art 21 TrHG - vis-a-vis criminal courts in pending criminal proceedings as well as the Liechtenstein Financial Intelligence Unit (FIU) and the supervisor, the Liechtenstein Financial Market Authority (FMA). Even under the Hague Convention on the Taking of Evidence Abroad in Civil and Commercial Matters, to which the United States of America and also the Principality of Liechtenstein are both contracting parties, requests for mutual legal assistance are not executed by the Principality of Liechtenstein based on its declaration under Art 23 of The Hague Convention. As a consequence, **there is no regulation under**

> **Liechtenstein law and no international legal obligation that contradicts the trustee's secrecy under Art. 21 TrHG, and the trustee's right to refuse to testify under § 321 ZPO**.

*Id.* at 30 (emphasis added).

The February 15, 2022 letter -- like the January 10, 2022 letter -- is addressed to SCB's counsel, Mr. Van Leeuwen. [ECF No. 92-9]. It lists the seven categories of documents[7] requested in this action and states that the information being sought "insofar

---

7       These seven categories of documents are:

(i) any and all documents showing Soleil Chartered Banks' financial ability to extend [a] $250 Million [credit] line in July 2020;

(ii) any and all of Soleil Charted Bank's profit and loss statements for 2018-2020;

(iii) any and all of Soleil Chartered Bank's balance sheets for 2018-2020;

(iv) any and all independent audits of Soleil Chartered Bank for 2018-2020;

(v) any and all of Soleil Chartered Bank's cash flow statements for 2018-2020;

(vi) any and all of Soleil Chartered Bank's tax returns for 2018-2020;

(vii) any and all documents that reflect any assets Soleil Chartered Bank owns, including but not limited to stocks, bonds, or real property.

[ECF No. 92-9, p. 1]. They are a summary of the documents SCB was ordered to produce pursuant to the Court's January 6, 2022 and February 10, 2022 Post-Discovery Hearing Administrative Orders. [ECF Nos. 62; 67].

as it is not publicly accessible, is confidential with regard [to] the Company itself and the Trust which holds the company."[8] *Id.* at 2.

The letter refers back to the legal opinion letter dated January 10, 2022 [ECF No. 92-5, pp. 26-31], and cites the Trustee's "obligation pursuant to Art. 21 of the Law of November 8th, 2013 concerning Professional Trustees and Fiduciaries (Trustee Act) (TrHG), LGBl. 2013 No. 421, as lastly amended on January 10, 2021, ruling [on] the Trustee's obligation of confidentiality." [ECF No. 92-9, p. 2].

The letter states that:

> We also point out again that this Art. 21 TrHG constitutes a state-recognized obligation of confidentiality, incumbent upon every Trustee, **insofar as he or she were not to be exempted from it by its [sic] client**. Any violation of this obligation could be a crime under Liechtenstein laws.
>
> Since the procedure Civ. Action No.: 21-20875 obviously provides for neither criminal proceedings nor supervisory proceedings and is a purely civil proceeding before a civil court, the Trustee not only has the right to refuse any disclosure of information originating from his or her business relation to the client, but before all has the obligation by law to treat all the information entrusted to him by his client as confidential. Further, **there has been no authorisation[9] whatsoever on the part of the Trustee's Client to disclose any information concerning the Trust or the Company** which is not already available from public sources **to any third party, including in the context of these civil proceedings.**

---

[8]     The February 15, 2022 letter defines the word "Company" to mean Soleil. [ECF No. 92-9, p. 2].

[9]     The letter utilizes the British spelling of the word authorization.

*Id.* (emphasis added; footnote added). The letter concludes with the statement that the Trustee will not be providing the requested documents and information pursuant to its obligation of confidentiality under Art. 21 TrHG. *Id.* at 3.

In *In re Chase & Sanborn Corp.,* the Eleventh Circuit addressed the imposition of sanctions against two defendants for their failure to obey a bankruptcy court's order compelling them to provide discovery in aid of execution. 872 F.2d at 398. In *In re Chase & Sanborn Corp.,* as in the instant case, the defendants argued that they could not comply with the discovery order because foreign laws prohibited them from doing so. *Id.*

The defendants in that case filed an affidavit from "Colombian counsel which stated that the Colombian constitution prohibited, and the law criminalized, the release of information from the books and records of Colombian mercantile banking companies." *Id.*

The Eleventh Circuit found that the defendants had not met their burden of showing an impossibility of compliance with the bankruptcy court's discovery order:

> "To succeed on this defense . . . the respondent must go beyond a mere assertion of inability and satisfy his burden of production on the point by introducing evidence in support of his claim." *United States v. Hayes*, 722 F.2d 723, 725 (11th Cir. 1984). The defendants failed to do so. **They did not make "all reasonable" efforts to comply with the court's order**. *United States v. Rizzo*, 539 F.2d 458, 465 (5th Cir. 1976). **Neither of the courts below found, nor do we find that the conclusory statements in the affidavit of defendants' Colombian counsel proffered by defendants sufficiently showed an impossibility to comply with the discovery orders. Furthermore, defendants made no effort to obtain a waiver of the Colombian laws to produce discovery, if such a waiver was indeed necessary**. *See Laker Airways, Ltd. v. Pan American World Airways, et al.*, 103

F.R.D. 42 (D.D.C. 1984). We find no support in the record, except defendants' counsels' representation, that only the judgment creditor, and not the defendants, could apply for a waiver.

*Id.* at 400 (emphasis added).

Similarly, here, SCB has not met its burden of proof on its impossibility of compliance defense. SCB has not argued that it does not have the responsive documents or cannot obtain them. Instead, it says it cannot produce them because of the Liechtenstein blocking law. SCB has presented two letters from a law firm in Liechtenstein addressing Liechtenstein's blocking law. These letters, however, are insufficient to show it was impossible for SCB to comply with the Court's discovery Orders.

The February 15, 2022 letter states that "Art. 21 TrHG constitutes a state-recognized obligation of confidentiality . . . **insofar as [the Trustee] were not to be exempted from it by its client**." [ECF No. 92-9, p. 2 (emphasis added)]. Thus, a plain reading of the letter suggests that the Trustee *can* produce the records and information if SCB simply agrees to exempt the Trustee from its confidentiality obligation.

Moreover, SCB has not shown that it has made all reasonable efforts to comply with the discovery Orders. The February 15, 2022 letter notes that "there has been no authorisation whatsoever on the part of the Trustee's Client to disclose any information concerning the Trust or the Company . . . to any third party, including in the context of these civil proceedings." [ECF No. 92-9, p. 2]. The letter does not address what would

happen if SCB provided that authorization to the Trustee. Thus, the letter itself leaves open the possibility that if SCB authorized the Trustee to turn over the documents to Plaintiff or if SCB directly requested the documents from the Trustee, that Liechtenstein law would not prohibit the Trustee from carrying out SCB's instructions. It appears that the real holdup is not the blocking law -- it is SCB's *own* refusal to authorize the release of responsive documents.

SCB argues that the Court cannot consider Plaintiff's interpretations of the letters from the Liechtenstein law firm because Plaintiff has not presented competing evidence on Liechtenstein law. But the burden of proof is on SCB (not Plaintiff) to show that Liechtenstein law prohibits SCB's compliance with the discovery Orders. *In re Chase & Sanborn Corp.*, 872 F.2d at 400. Because the Liechtenstein letters leave open the possibility that SCB *could* obtain the withheld discovery (e.g., by exempting the Trustee from its confidentiality obligation, by authorizing the Trustee to disclose the records, or by directly requesting the records from the Trustee, etc.), SCB has not shown that Liechtenstein law prohibits SCB from complying with the Court's discovery Orders.

Additionally, SCB finds itself in a predicament of its own making. It was SCB who structured itself in such a way that it is owned by a Liechtenstein Trust Company. It was SCB who decided to keep its financial records and information locked away in Liechtenstein, purportedly subject to Liechtenstein's blocking law. And it was SCB who

-- as far as the Undersigned is aware[10] -- has yet to provide authorization to its Trustee to release the documents and information.

In sum, SCB has been given multiple opportunities to comply with the Court's discovery Orders and to provide the necessary discovery in this case. SCB has not shown that compliance with those Orders was impossible, despite making all reasonable efforts to comply. The Liechtenstein letters leave open the possibility that SCB could obtain the withheld discovery and there is no record evidence that SCB took any additional, reasonable steps to comply with the Court's Orders, such as by providing authorization to the Trustee. Moreover, SCB was the architect of its own claimed inability to comply.

Under these circumstances, the Undersigned concludes that SCB's failure to provide discovery responses after twice being ordered to do so was willful.

**B.     Plaintiff was Prejudiced by SCB's Discovery Violations**

Bluestar has been prejudiced by SCB's willful refusal to comply with the Court's discovery Orders and produce documents and information concerning its financial worth.

---

[10]     There is no record evidence that SCB directly contacted the Trustee and instructed the Trustee to release the records to Bluestar (or to SCB to provide to Bluestar). According to the February 15, 2022 letter, SCB has not done so. [ECF No. 92-9, p. 2 ("[T]here has been no authorisation whatsoever on the part of the Trustee's Client to disclose any information concerning the Trust or the Company which is not already available from public sources to any third party, including in the context of these civil proceedings.")].

Bluestar is entitled to this discovery to prove its claims and to test Soleil's (and the other defendants) defenses. The withheld discovery concerning Soleil's financial worth is plainly pivotal to Plaintiff's case. As Bluestar notes in its reply, "[i]f the discovery sought reveals that SCB has no or nominal funds from all its depositors and that SCB itself has a nominal net worth, SCB could not dispute that its comfort letter is a sham." [ECF No. 94, p. 3]. Moreover, SCB's failure to provide this discovery is especially prejudicial because Bluestar has no alternative avenue for obtaining the same information from another source.

Plaintiff's inability to obtain the withheld discovery makes it exceedingly difficult for Plaintiff to prove its case. To prevail on its claims, Bluestar needs to show that R&T did not in fact have $250 million of good, clean, cleared, lien-free, and unencumbered funds on deposit with SCB. The withheld discovery would show whether SCB in fact had these funds on deposit as of July 2020, whether SCB did in fact engage in due diligence to confirm the representations it made in the so-called comfort letter, and whether SCB has a dubious origin (i.e., it is supposedly chartered by the Union of the Comoros, which is a small country of three main islands and a disputed fourth island and has "[o]ne of the world's poorest and smallest economies," with an estimated real GDP per capita of

$3,100 as of 2020). *See* Central Intelligence Agency, THE WORLD FACTBOOK (2008), https://www.cia.gov/the-world-factbook/countries/comoros (last visited May 13, 2022).[11]

Soleil's actions (and inactions) made it impossible for Bluestar to obtain crucial documents and information. Soleil's unjustified and continued failure to comply with the Court's discovery Orders has resulted in real prejudice to Plaintiff.

### C.   Less Severe Sanctions than the Striking of SCB's Pleadings Would not be Sufficient

"The Court must also consider whether lesser sanctions would be appropriate." *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1556 (11th Cir. 1986) ("On appeal we will find abuse of discretion if lesser sanctions would suffice."); *Wallace v. Superclubs Properties, Ltd.*, No. 08-61437-CIV, 2009 WL 2461775, at *7 (S.D. Fla. Aug. 10, 2009) ("[A]ny sanctions awarded under Rule 37 must be "just and proportionate to the offense." (quoting *Rude v. The Dancing Crab at Washington Harbor, L.P.*, 245 F.R.D. 18, 22 (D.D.C. 2007))). However, "some cases speak for themselves and are clear enough without the district court adding a section to its opinion to explain why lesser sanctions were not used." *Phipps v. Blakeney*, 8 F.3d 788, 791 (11th Cir. 1993).

"[T]he decision to strike a claim or answer 'ought to be a last resort–ordered only if noncompliance with discovery orders is due to willful or bad faith disregard for those

---

[11]    The Undersigned takes judicial notice of facts set forth in the CIA's World Factbook. *See, e.g.*, *Philipps v. Talty*, 555 F. Supp. 2d 265, 267 n.2 (D.N.H. 2008) (taking *sua sponte* judicial notice of facts concerning the island of St. Martin/St. Maarten and citing the CIA Factbook).

orders.'" *Wyndham Vacation Ownership, Inc., v. Slattery, Sobel & Decamp, LLP*, No. 6:19-CV-1908-WWB-EJK, 2021 WL 5275700, at *3 (M.D. Fla. Nov. 10, 2021) (quoting *United States v. Certain Real Prop. Located at Route 1, Bryant, Ala.*, 126 F.3d 1314, 1317 (11th Cir. 1997)).

Here, the Undersigned has considered lesser sanctions -- such as the imposition of all three adverse inferences -- and finds that no other sanction short of the striking of SCB's pleadings would ensure compliance with the Court's discovery orders and adequately punish SCB's willful noncompliance.

The imposition of an adverse inference (or inferences) is oftentimes too lenient a sanction. *See Inmuno Vital, Inc. v. Telemundo Grp., Inc.*, 203 F.R.D. 561, 574 (S.D. Fla. 2001) ("[S]ome courts have decided to instruct the jury as to negative inferences that should be drawn from violation of discovery orders, in lieu of striking the infracting party's pleadings. However, courts and commentators have noted that 'adverse inference instructions are one of the least severe sanctions which the court can impose and, therefore, often have very little deterrent effect.'" (quoting *Mosel Vitelic Corp. v. Micron Tech., Inc.*, 162 F. Supp. 2d 307, 315 (D. Del. 2000))).

Moreover, and as a practical matter, instructing the jury on what it would need to infer as to only Soleil would likely confuse the jury and prejudice the other, non-violating Defendants. *See, e.g., Estate of Cindy Lou Hill v. Naphcare, Inc.*, No. 2:20-CV-00410-MKD, 2022 WL 1464830, at *16 (E.D. Wash. May 9, 2022) (addressing spoliation motion and finding that proposed adverse inference "would confuse the jury and create a risk that

the jury would impermissibly consider the adverse inference when determining the liability of [other defendants]").

The striking of SCB's pleadings is appropriate in this situation, where lesser sanctions would not suffice.

### D.      Request for Entry of a Default Judgment Against SCB

Bluestar also asks for the entry of a default judgment against SCB. "While the Court may enter a default judgment against a party for failure to plead or otherwise defend the case and also as a sanction for failure to obey a pretrial order, default judgments may not be appropriate if they will result in inconsistent judgments." *Chavez v. Grill Enterprises*, LLC, No. 20-22603-CIV, 2020 WL 10229081, at *7 (S.D. Fla. Dec. 1, 2020); *see also Mayorga v. Stamp Concrete & Pavers, Inc.*, No. 13-81274-CIV, 2015 WL 3556972, at *2 (S.D. Fla. June 4, 2015) ("The general rule, derived from the seminal case of *Frow v. De La Vega*, 15 Wall. 552, 82 U.S. 552, 21 L.Ed. 60 (1872), is that 'when one of several defendants who is alleged to be jointly liable defaults, judgment should not be entered against that defendant until the matter has been adjudicated with regard to all defendants, or all defendants have defaulted.'" (quoting *Hitachi Medical Sys. Am. v. Horizon Med. Group*, No. 5: 07CV02035, 2008 WL 5704471, at *3 (N.D. Ohio Jan. 28, 2008))).

Here, some of Plaintiff's claims against Defendants (and Defendants' defenses) are intertwined such that the issuance of a default judgment against SCB, at this point in time,

could later result in inconsistent judgments. By way of example, the Undersigned notes

that in the wherefore clause of its FDUTPA claim, Plaintiff

> demands judgment against Enis, R&T, and [Soleil], **jointly and severally**, for monetary damages, consequential damages, pre- and post-judgment interest, attorney's fees and court costs, and that an injunction be imposed prohibiting any further violations of FDUTPA, and asks this Court to impose a constructive trust or other equitable lien on the $300,000.00 transferred to the Trust, together with such other relief as this Court may deem just and proper.

[ECF No. 33, p. 29 (emphasis added)]. Because Bluestar would still need to prove its case

against the other Defendants, the Court should not enter a default judgment against SCB,

at this juncture.

### E.      Request for Attorney's Fees under Fed. R. Civ. P. 37(b)(2)(C)

Bluestar also asks for "attorney's fees caused by SCB's failure to comply with its

discovery obligations and to obey this Court's clear orders." [ECF No. 85, p. 16]. Bluestar

should be awarded the reasonable expenses it incurred in attempting to obtain Soleil's

compliance with the Court's discovery Orders because Soleil's purported reason for

withholding the discovery (the Liechtenstein blocking law) was not substantially

justified.

However, because Bluestar has already received a fee-shifting award of $1,000.00

in connection with the January 6, 2022 discovery hearing [ECF No. 62] and a fee-shifting

award of $1,000.00 in connection with the February 10, 2022 hearing [ECF No. 67], any

subsequent fee application filed by Bluestar should not include expenses addressed at those hearings.

## IV.    CONCLUSION

For the reasons stated above, the Undersigned **respectfully recommends** that the District Court **grant in part and deny in part** Plaintiff's sanctions motion. The Court should **strike** Soleil's pleadings and **grant as to entitlement** Plaintiff's fee request pursuant to Rule 37(b)(2)(C), with the amount and reasonableness of such fees to be determined after briefing.

## V.    OBJECTIONS

The parties will have seven (7)[12] days from the date of being served with a copy of this Report and Recommendations within which to file written objections, if any, with the United States District Judge. Each party may file a response to the other party's objection within seven (7) days of the objection. Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*,

---

[12] The Undersigned is shortening the time for objections and responses because the issues have already been well briefed, the Court already held a hearing and other critical deadlines are imminent.

885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY RECOMMENDED**, in Chambers, in Miami, Florida, on May 16, 2022.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

<u>**Copies furnished to**</u>:
The Honorable Robert N. Scola, Jr.
All Counsel of Record