UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

BLUESTAREXPO, INC.,                                         Civil Action No. 21-20875-Civ-Scola

    *Plaintiff*,

vs.

JAY ENIS, et al.,

    *Defendants*.

_____/

## AFFIDAVIT OF FARIS HUSSAIN

Before me, the undersigned authority, did personally appear Hussain Mohamed Fariz, after first affirming, deposes and states as follows:

    1.    My name is Hussain Mohamed Fariz; I go by the name Faris Hussain. I am the president of Bluestarexpo, Inc. ("**Bluestar**"), a corporation organized under the laws of Delaware located in Charlotte, North Carolina.

    2.    I am over the age of eighteen and I am *sui juris*. I make this affidavit based on facts and circumstances personally known to me or based upon my review and examination of Bluestar's business records maintained in the regular course of business.

    3.    Bluestar was established in 2020 and operates as a purchaser and seller of personal protective equipment ("**PPE**"), which became in high demand in 2020 as a result of the COVID-19 pandemic.

    4.    Perry Crooke is my business partner and is an officer of Bluestar. I own 25% of the capital stock of Bluestar, my brother owns 25% of the capital stock of Bluestar, and Mr. Crooke owns 50% of the capital stock of Bluestar.

{00682573}

5. On or around May 2020, Bluestar, through an introduction made by a broker situated in Turkey, was negotiating with Wish Paradise Corporation, ("**Wish**"), a Taiwan-based producer of nitrile gloves, for the purchase of 285 million dollars' worth of nitrile gloves.

6. On July 31, 2020, Bluestar entered in an agreement with Wish for the purchase of $285 million of nitrile gloves. A condition precedent to Bluestar's agreement with Wish was that Bluestar provide Wish with a proof of funds letter to demonstrate to Wish that Bluestar had control of cash or lines of credit that would enable Bluestar to purchase $250,000,000.00 of nitrile gloves with capital under its control.

7. Wish therefore required Bluestar to provide proof of its ability to close on the transaction in the form of producing a bank comfort letter from a U.S.-chartered bank to Wish showing Bluestar's ability to tender $250,000,000.00 in payment.

8. I was introduced to Jay Enis through a friend and business acquaintance who lives and works in Miami, Florida. In May or June of 2020, I contacted Jay Enis on behalf of Bluestar to inquire about his ability to fund a transaction for the purchase of nitrile gloves from Wish, which would require presentation of a bank comfort letter to Wish confirming availability of $250,000,000.00 in funds.

9. I informed Enis that Bluestar had many U.S.-based potential buyers interested in purchasing the product due to the high demand for PPE. Demand was so high at that time that Perry Crooke and I expected to resell the gloves for a profit of at least approximately $54,000,000.00 based on then-current market forces.

10. Mr. Enis represented himself as a very wealthy businessman, in fact a billionaire, who owned many businesses, including his pharmaceutical company, R&T Pharmacy, which Mr.

Enis represented was active in the PPE business as a merchant. He told me that he could finance Bluestar's $250 million transaction with Wish through his or his businesses' funds.

11. Mr. Enis further confirmed his ability to obtain a bank comfort letter from a U.S.-chartered bank in the amount of $250 million either in his personal capacity or through R&T Pharmacy.

12. Based on Enis' representations, I entered in a joint venture agreement on behalf of Bluestar with Mr. Enis and R&T whereby Mr. Enis was going to finance the purchase of $250 million of nitrile gloves from Wish in exchange for 45% of expected profits from Bluestar's resale of the gloves. Of the 45% Mr. Enis was to earn. Mr. Enis promised to compensate the individual who introduced Bluestar to him.

13. After entering in this agreement, Mr. Enis proceeded to correspond with Mr. Crooke and myself suggesting potential other sellers, buyers, terms of purchase and shipping, and finance for the nitrile gloves.

14. Mr. Enis introduced us to Soleil Chartered Bank, claiming that it was a U.S.-chartered bank with which he banked and would produce the necessary bank comfort letter for $250 million after it reserved against his funds.

15. Mr. Enis proceeded to obtain a bank comfort letter from Soleil Chartered Bank addressed to Bluestar confirming that R&T Pharmacy held funds or a credit line of $250 million in an account at Soleil Chartered Bank. The letter was signed by Govind Srivastava, as managing director of Soleil Chartered Bank, and Syed Ali Abbas, as director of MENA trade finance for Soleil Chartered Bank.

16. On July 28, 2020, Mr. Enis forwarded the letter to Mr. Crooke and myself, requesting remittance of $300,000 to pay for partial payment of the $625,000 fee Soleil Chartered

{00682573}

Bank charged for the letter and for reserving against Mr. Enis' funds.  Mr. Enis told us he had already paid $625,000 to Soleil Chartered Bank and instructed us to reimburse him for half of the fee by wiring $300,000 to his family trust.

17. On July 28, 2020, Bluestar wired $300,000 to Mr. Enis to the Enis Family Trust bank account.

18. Soon thereafter, we presented the Soleil Chartered Bank letter to Wish as proof of our ability to finance the proposed purchase of $250 million of nitrile gloves.

19. Wish declined to accept the letter as proof of our ability to fund because it claimed Soleil Chartered Bank was not a reputable bank.

20. We went back to Mr. Enis to understand what had happened, and he insisted that the letter was authentic and that in fact his funds were available at Soleil Bank.  He also began to suggest other sellers from which we could potentially purchase gloves.

21. After we realized that Soleil Chartered Bank was a fraud, we attempted to limit our losses and asked Mr. Enis if he could finance the purchase of one million boxes of gloves from one of his different sellers, in the hope that we could recoup the $300,000 we spent for the worthless letter from Soleil Chartered Bank.

22. Based on Mr. Enis' representations of being able to arrange a new seller, we sent him a purchase order for 20 million boxes of nitrile gloves thinking he would forward it on to a new seller that he could arrange.  Mr. Enis never came forward with a viable seller that could sell us even one million boxes of gloves.

23. We asked Mr. Enis to refund us the $300,000 fee Bluestar had wired to his trust.  Mr. Enis claimed that he had already sent $625,000 to Soleil Bank and that he had lost on the fraud as well.

{00682573}

24. We, through our attorneys, sent demand letters to Soleil Chartered Bank, Mr. Srivastava, Mr. Abbas, and Mr. Enis demanding the refund of our fee, but Soleil Chartered Bank. Mr. Srivastava, Mr. Abbas, and Mr. Enis refused to refund us.

25. Bluestar never received any money back from Soleil Chartered Bank or Mr. Enis' trust.

26. Bluestar could not secure other financing and failed to close on the transaction with Wish. As a result, Bluestar lost the opportunity to purchase the nitrile gloves from Wish and the profit that Bluestar would have earned from the purchase and resale of the nitrile gloves.

**FURTHER AFFIANT SAYETH NAUGHT.**

Dated this 27th day of May, 2022

_____
Faris Hussain

STATE OF __NC__         )
                        ) SS:
COUNTY OF __Mecklenburg__ )

SWORN TO AND SUBSCRIBED before me this 27 day of May 2022, by Faris Hussain, who is personally known to me and who did take an oath and said that the foregoing Affidavit is true and correct.

_____
Stephanie Roskoskey
SIGNATURE OF NOTARY

My commission expires 5/18/2026

{00682573}