United States District Court
for the
Southern District of Florida

| | | |
|---|---|---|
| BluestarExpo, Inc., Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 21-20875-Civ-Scola |
| | ) | |
| Jay L. Enis and others, | ) | |
| Defendants. | ) | |

### Omnibus Order on Motions for Summary Judgment

Plaintiff BluestarExpo, Inc., seeks to recover $300,000 in payments and $35 million in lost profits from individual Defendants Jay L. Enis, Grovind Srivastava, and Syed Ali Abbas; and entity Defendants The Enis Family Trust (the "Trust"), Soleil Chartered Bank, and R & T Pharmacy Corp. (2nd Am. Compl. ("Compl."), ECF No. 33.) Previously, the Court dismissed several of the seventeen counts set forth in the complaint, some in their entirety, some as to only certain Defendants. (Court's Order of Part. Dismissal, ECF No. 44.) Later, the Court struck Soleil's answer and the Clerk entered a default against it, thus rendering moot issues regarding Soleil's liability as to counts one, two, eleven, fifteen, sixteen, seventeen, at least as far as the cross motions for summary judgment are concerned. (Court's Order Adopting Rep & Rec., ECF No. 153.) The following claims, then, are at issue with respect to the pending and fully briefed cross motions for summary judgment and the indicated Defendants:

| Count | Defendant |
|---|---|
| <u>One</u>: Fraudulent misrepresentation | Srivastava and Abbas |
| <u>Four</u>: Civil theft | The Trust |
| <u>Seven</u>: Unjust enrichment | The Trust |
| <u>Eight</u>: Breach of Contract | Enis and R&T |
| <u>Eleven</u>: Civil conspiracy | All Defendants (except Soleil) |
| <u>Sixteen</u>: Florida's Deceptive and Unfair Trade Practices Act | Enis, and R&T |

The parties each claim, in their respective motions, that there are no issues of material fact and that they are each entitled to summary judgment as a matter of law regarding the relevant claims. Enis, R&T, and the Trust (collectively, the "Enis Defendants") filed a joint motion, claiming Bluestar has been unable to adduce evidence establishing its claims for civil theft, unjust enrichment, breach of contract, civil conspiracy, or FDUTPA. (Enis Defs.' Mot.

for Summ. J., ECF No. 118.) Srivastava and Abbas filed a joint motion, captioned as a motion for summary judgment, but arguing that the counts against them, for fraudulent misrepresentation and civil conspiracy should be dismissed. (Srivastava and Abbas's Mot. for Summ. J., ECF No. 112.) Conversely, Bluestar has filed a motion for summary judgment, arguing that the record clearly establishes its entitlement to judgment in its favor on all remaining counts. (Pl.'s Mot. for Summ. J., ECF No. 115.) All three motions are fully briefed and ripe for the Court's review. For the following reasons, the Court **denies** Bluestar and Srivastava and Abbas' motions in their entirety (**ECF Nos. 112, 115**) and **grants in part and denies in part** the Enis Defendants' motion (**ECF Nos. 118**).

### 1. Background

Several months into the COVID-19 pandemic, Farris Hussain and Perry Crooke, through Bluestar, their North Carolina company, incorporated in Delaware in April 2020, began negotiating a deal involving the purchase and immediate resale of thirty-million boxes of powder-free nitrile examination gloves. To that end, Bluestar says it intended to purchase the gloves from Wish Paradise Corp., a Taiwanese company, for $250 or $285 million, and then resell them, upon receipt, to a buyer that Bluestar had already lined up. (Pl.'s Stmt. of Facts ¶ 8, ECF No. 116; Enis Defs' Stmt. of Facts ¶5, ECF No. 117.) Bluestar maintains it expected the profit on the deal would be at least $30 million. (Pl.'s Stmt. ¶ 13.) Bluestar did not, however, have access to the funds, itself, necessary to purchase the gloves. (Enis Defs.' Stmt. ¶ 10.)

Much of the parties' dispute centers on whether Bluestar's negotiations with Wish ever actually ripened into a contract. Bluestar says that a key component of its purported agreement with Wish was its proffering of "a bank comfort letter from a U.S.-chartered bank to Wish showing Bluestar's ability to tender $250,000,000 in payment." (Pl.'s Stmt. ¶ 10.) The Defendants question whether this was really part of Wish's requirements. (Enis Defs.' Resp. to Pl.'s Stmt. ¶ 10, ECF No. 129.) In any event, in its quest for a comfort letter, Bluestar was introduced to Enis, a Florida citizen, residing in Miami Beach, and his company, R&T, a pharmaceutical company in Brooklyn, New York, in May or June 2020, through a mutual acquaintance—Crooke's travel agent. (Pl.'s Stmt. ¶¶ 3, 6, 11.) According to Bluestar, Enis represented himself and R&T Pharmacy "as multibillionaires and transactional lenders who could fund Bluestar's transaction with Wish." (*Id.* ¶ 14.) The Defendants, however, dispute this, maintaining that Enis never agreed to "fund" the transaction, instead only agreeing, through R&T, to provide a bank comfort letter, "confirming the availability of $250,000,000 in funds." (Enis Defs.' Resp. Stmt.

¶ 14.) Bluestar says that, in exchange for the comfort letter and the funding, it agreed to pay Enis 45% of all profits which it estimated would range between $12 and $14 million. (Pl.'s Stmt. ¶ 17.) While the Defendants do not dispute the percentage breakdown, they insist any profits were to be paid to R&T, as opposed to Enis himself, and that neither Enis nor R&T ever agreed to fund the transaction. (Enis Defs.' Resp. Stmt. ¶¶ 12, 17.) Enis acknowledges that Bluestar specifically wanted a comfort letter from a United States chartered bank. (Enis Dep. 21:3–5, ECF No. 114-2.)

To procure the comfort letter, Enis reached out to a contact in Brooklyn, Rabbi Abraham Nussenzweig, for help. (Pl.'s Stmt. ¶ 20.) Nussenzweig, put Enis in contact with Abbas, whose title was "director of Middle East north Africa trade," at either Soleil Bank or its affiliate. (*Id.* ¶ 23; Srivastava and Abbas's Resp. to Pl.'s Stmt. ¶ 5, ECF No. 125, 2.) This was Enis's first contact with Soleil Bank, a bank registered and licensed under the laws of the Union of the Comoros—a group of islands off the eastern coast of Africa. (Pl.'s Stmt. ¶¶ 4, 24.) Ultimately, Enis obtained a draft comfort letter from Soleil Bank, forwarding it to Bluestar on June 27, 2022. (Enis Defs.' Stmt. ¶ 29.) The letter read as follows: "We, Soleil Chartered Bank, hereby confirm, with full bank responsibility and liability on behalf of our client account name R&T Pharmacy Corp. having account no: 2001RNTPHR7ETS8 has cash funds and/or credit line the amount of USD 250,000,000.00 (USD Two Hundred and Fifty Million Only)." (Enis Defs.' Resp. Stmt. ¶ 28.)

Enis asked Hussain and Crooke to review the draft, with blank signature lines provided for Srivastava and Abbas, and to confirm if it was acceptable. (Enis Defs.' Stmt. ¶ 29.) On the letter, Srivastava is identified as "Managing Director" and Abbas as "Director – MENA Trade Finance." (ECF No. 1-3.) The letter's footer also indicates Soleil Bank is registered in Comoros. (Enis Defs.' Stmt. ¶ 32.) Bluestar determined that the letter "seem[ed] like it was what [Bluestar] want[ed] it to say" and wired out $300,000—the amount Bluestar says it understood to be its portion of the fee for the issuance of the letter. (*Id.* ¶¶ 36–7.) Bluestar maintains Enis said that he had already sent $625,000 to Soleil Bank, in payment for the letter, and told Bluestar to send its share of the fee—the $300,000—to his family trust. (Pl.'s Stmt. ¶ 41.) Enis denies telling Bluestar that he sent the $625,000, maintaining that "as of that time, he already paid" what he refers to as "the $250,000 initial payment" to Soleil Bank. (Enis Defs.' Resp. Stmt. ¶ 41.) Regardless, Enis received the executed comfort letter from Soleil, signed by both Srivastava and Abbas, with the exact same verbiage as the draft, and then forwarded it to Bluestar. (Enis Defs.' Stmt. ¶ 40.) Although the timing of the parties' payments and transfers is contested, it is undisputed that Bluestar wired $300,000 to the Trust and that

the Trust wired $250,000 to Soleil Bank, or to an account associated with a Soleil Bank affiliate.

Bluestar says that, ultimately, Wish rejected the letter, complaining that Soleil Bank was not a reputable bank. (Pl.'s Stmt. ¶ 47.) The Defendants dispute this, maintaining Wish never even received the letter, much less rejected it. (Enis Defs.' Resp. ¶ 47.) Wish's involvement or non-involvement notwithstanding, Bluestar maintains the letter was fraudulent because, in reality, R&T had neither $250 million in funds nor a $250 million credit line. (Pl.'s Stmt. ¶ 28.) Bluestar, additionally, complains that Soleil Bank itself also never had control of funds that would be required to back a $250 million credit line. (*Id.* ¶ 33.) Further, says Bluestar, all of the Defendants were well aware of these purported deficiencies and misrepresentations. (*Id.* ¶ 32, 34.) To be clear, the Defendants do not dispute that R&T was unable to fund a $250 million transaction with its own funds. (Enis Defs.' Resp. ¶ 32.) Instead, at the heart of the parties' dispute is whether the comfort letter represented that it could: Srivastava and Abbas maintain that the letter's reference to a credit line relates to the collateral of the transaction—the $250 million worth of nitrile gloves (Srivastava and Abbas's Resp. to Stmt. ¶ 37); while Enis testified, along these same lines, that he only deals with "transaction financing" and that, typically, the credit in a given deal will depend on the transaction itself (Enis Dep. 13:2–8).

As a result of these events, Bluestar seeks not only the return of the $300,000 it paid for the purportedly bogus comfort letter but also the tens of millions of dollars it says it lost out on as a result of the comfort letter's triggering the collapse of its deal with Wish.

## 2. Legal Standard

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir.2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories, admissions on file and other documents, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323–24. The nonmovant's evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court will not weigh the evidence or make findings of fact. *Anderson*, 477 U.S. at 249; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the nonmoving party. *Id.* "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990).

### 3. Analysis

### A. Piercing the Corporate Veil

As an initial matter, the Enis Defendants and Bluestar disagree as to whether R&T's corporate veil can be pierced such that Enis can be held liable for R&T's debts. The Enis Defendants seek summary judgment in their favor on this issue, arguing that Bluestar has failed to provide any record evidence that would support a finding of alter-ego liability. (Enis Defs.' Mot. at 22.) In responding, Bluestar seems to conflate two separate issues: Enis's individual liability, on the one hand, versus Enis's alter-ego liability for R&T's debts, on the other. (Pl.'s Resp. at 14–16.) Because the Court agrees with the Enis Defendants, that Bluestar has not come forward with any evidence that R&T is the mere alter ego or instrumentality of Enis, it grants summary judgment in their favor on this issue.

To begin, "[a] mere instrumentality finding is rare." *Segal v. Forastero, Inc.*, 322 So. 3d 159, 163 (Fla. 3d DCA 2021) (cleaned up). In order to pierce R&T's corporate veil, Bluestar has to prove three factors: (1) Enis "dominated and controlled [R&T] to such an extent that [its] independent existence, was in fact non-existent" and Enis was in fact R&T's alter ego; (2) R&T's "corporate form must have been used fraudulently or for an improper purpose"; and (3) "the fraudulent or improper use of [R&T's] corporate form caused injury to [Bluestar]." *Gasparini v. Pordomingo*, 972 So. 2d 1053, 1055 (Fla. 3d DCA 2008).

Bluestar's attempt to marshal record evidence sufficient to pierce R&T's corporate veil stumbles out of the gate, with the first factor. In seeking to establish Enis's domination and control, such that R&T had no separate existence independent from Enis, Bluestar points to various factors: R&T's insolvency as of 2018; R&T's abandonment of its primary place of business in Brooklyn; Enis's receipt of payment, through the Trust, rather than R&T, of the $300,000 from Bluestar; Enis's failure to make clear, in his email exchanges with Bluestar, that "he was acting solely in his role as president of defunct R&T"; and Enis's use of an email address associated with a private merchant bank Enis was affiliated with rather than with an R&T domain name. (Pl.'s Resp., ECF No. 128, 15.) While these aspects of R&T and Enis's relationship with R&T hint at a poorly run, sloppily maintained, and apparently collapsing corporate entity, they fall short of setting forth facts, even read in the light most favorable to Bluestar, from which the Court could infer that R&T actually had no existence apart from Enis. *See Hilton Oil Transport v. Oil Transport Co., S.A.*, 659 So. 2d 1141, 1152 (Fla. 3d DCA 1995) (recognizing that facts showing a shareholder's operating his company in a "loose and haphazard manner" does "not justify the imposition of personal liability against [the shareholder]"); *cf. Am. Intern. Group, Inc. v. Cornerstone Businesses, Inc.*, 872 So. 2d 333, 337 (Fla. 2d DCA 2004) (finding that a payment to a parent company, rather than to its subsidiary, is insufficient to support disregarding the corporate form of the subsidiary). This is especially so in light of record evidence showing that (1) R&T maintained its own financial documents (*e.g.*, ECF No. 114-4, 114-13); (2) R&T filed its own tax returns (Enis Dep. 33:12–13); (3) R&T had its own bank accounts (ECF No. 114-13); (4) R&T had been formed in 2016 and purchased by Enis in 2018, operating, largely, as "pharmacy that specializes in compounding prescriptions" as well as being "in the business of procuring [personal protective equipment]" (Enis Dep. at 31:3–6, 18–23; 33:18–19); and (5) R&T, at least at one point, employed a pharmacist and compounder (*Id.* at 31:9–14). These undisputed facts all show that R&T had "conducted significant business undertakings," and therefore had its own, separate identity, apart from Enis. *Segal*, 322 So. 3d at 163 (concluding that, even where a contractual obligation had been signed by a corporate entity that, at the time, had no assets, business, or bank account, piercing the corporate veil was nonetheless improper because the entity had been previously actively engaged in commercial business).

As to the second and third elements, Bluestar's showing also falls short. Instead of identifying facts establishing that Enis specifically used R&T's corporate form fraudulently or for an improper purpose and that this use, in particular, caused Bluestar's injury, Bluestar instead argues, circularly, that

Enis should be held liable, for R&T's debts, "because [Enis] conducted the fraud not on his own behalf, but on the behalf of a bankrupt company over which he was the sole owner and business-decision maker that he used as his instrumentality." (Pl.'s Resp. at 15.) While the Court agrees, as set forth below, that the record establishes the need for a trial to determine genuine issues of material fact with respect to Bluestar's allegations of Enis and R&T's improper conduct, Bluestar fails to show, separate and apart from those issues, how Enis's use of the corporate form itself actually facilitated that conduct. In short, Bluestar's showing, as to the second and third elements, is purely conclusory and bereft of any factual support.

As a final note, the Court recognizes that Bluestar, in addressing the Enis Defendants' alter-ego arguments, intermingles issues that relate to Enis's liability for his own conduct. Nothing about the Court's analysis, above, as to declining to disregard R&T's corporate form, should be read to absolve Enis for his own conduct.

## B. Breach of Contract

Through its breach-of-contract claim, Bluestar describes the obligations of "Enis/R&T" as having three facets: (1) "Enis/R&T's promise to provide a valid comfort letter truthfully stating that R&T had $250,000,000.00 in cash funds available for the transaction with Wish"; (2) "the actual transfer of $250,000,000.00 to Soleil to help facilitate the transaction between Bluestar and Wish"; and (3) "transferring $250,000,000.00 to Wish for [the] impending transaction." (Compl. ¶ 69.) Bluestar alleges "Enis/R&T" breached their agreement on two fronts: by failing to (1) provide a valid comfort letter and (2) transfer $250 million to Soleil on Bluestar's behalf.  (Compl. ¶ 70.) In its motion for summary judgment on its breach-of-contract claim, Bluestar's argument focuses on "Enis and/or R&T's" obligation to provide funding for Bluestar's purchases of the gloves from Wish, making only passing reference to its allegation that Enis and R&T also breached their agreement to provide a valid comfort letter. (Pl.'s Mot. ¶¶ 41–42 ("Bluestar and [Enis] agreed that Enis and/or R&T would provide funding for Bluestar's purchase of $250 million in nitrile gloves . . . .") ("Enis and R&T's failure to supply the funds necessary to close on the transaction with Wish amounted to a material breach.").) The target of the Enis Defendants' motion, on the other hand, is a bit broader. The Enis Defendants argue Bluestar has failed to set forth any evidence establishing that (1) Bluestar had any agreement with Enis individually; (2) the comfort letter was fraudulent; or (3) Bluestar suffered lost-profit damages. (Enis Defs.' Mot. at 16–19.)

On the offensive side, Bluestar has failed to establish its entitlement to summary judgment against either Enis or R&T on its breach-of-contract claim. Bluestar acknowledges that it and Enis disagree as to the nature of their agreement. Bluestar maintains that "[i]t is patently obvious to any observer that the contract between Bluestar and Enis contemplated Enis and R&T's putting up funds to purchase $250 million in nitrile gloves." (Pl.'s Mot. ¶ 10.) In contrast, and as Bluestar points out, Enis insists and has testified that he would receive a share of the proceeds for "providing a value" and "being able to give [Bluestar] a bank comfort letter." (Enis. Dep. 22:22–23:2; *see also id.* at 97:10–20 (referring to the value of Enis's "intellectual capital" in facilitating the transaction).) Despite the divergent record evidence, Bluestar maintains it is nonetheless entitled to summary judgment on its breach of contract count because "[i]t would be impossible for a reasonable jury to conclude that the contract was anything other than . . . Enis and R&T['s] providing the funds in exchange for a large share of the profits." (Pl.'s Mot. ¶ 10.) Indeed, says Bluestar, no reasonable jury would believe that Bluestar agreed to pay Enis such an "exorbitant amount of money" for simply referring Bluestar to a bank. (*Id.* ¶ 41.) Further says Bluestar, Enis's position is additionally undercut by "his representation to Bluestar that Soleil Bank was reserving the credit facility against [Enis's] funds." (*Id.* ¶ 41.)

Despite Bluestar's characterization of Enis's understanding of the parties' agreement as being absurd, the Court finds no way around this being a credibility issue and, therefore, improper for a determination on a summary-judgment basis. Viewing this evidence in the light most favorable to Enis and R&T, a fact finder could choose to credit Enis's testimony and find that, indeed, the parties agreed that Enis or R&T would be compensated millions of dollars, assuming the deal with Wish proceeded, for simply introducing Bluestar to a bank that would provide the comfort letter and lending Enis or R&T's expertise and knowledge to the transaction. Other than Bluestar's conclusory insistence that it would be impossible for a reasonable jury to believe Enis's testimony, Bluestar provides no actual support for its position: even if a jury were to agree with Bluestar that such an agreement might be irrational, it does not necessarily follow that that jury would have to find that the parties in this case acted reasonably or wisely. That is, parties are free to enter into lopsided or ill-advised contracts if they so choose. Ultimately, then, Bluestar has failed to demonstrate an absence of a genuine issue of material fact regarding its version of what the parties actually agreed to. Because of Bluestar's failure to establish the nature of the contract, for the purposes of summary judgment, it has also failed to show an absence of material fact regarding Enis and R&T's alleged breach of that contract or Bluestar's entitlement to damages.

On the flip side, Enis and R&T maintain they are entitled to summary judgment themselves on three distinct aspects of Bluestar's breach-of-contract claim: (1) whether Enis himself entered into any agreement with Bluestar; (2) whether the comfort letter was fraudulent; and (3) whether Bluestar is entitled to recover lost-profit damages based on the arrangement with Wish falling apart. The Court finds the Enis Defendants fall short on establishing their entitlement to summary judgment on the first two issues but agrees Bluestar has failed to ward off summary judgment regarding its claims for lost profits.

As to Enis's purported lack of individual liability, on Bluestar's breach-of-contract claim, the Enis Defendants point to evidence they say conclusively shows that any agreement Bluestar might have had was with R&T and not with Enis. For example, they proffer a draft joint-venture agreement that presented R&T as the contracting party and Bluestar's acknowledgment that the draft agreement was consistent with Bluestar's understanding of its agreement with R&T. (Enis Defs.' Stmt. ¶¶ 27–8.) The Enis Defendants also refer to Bluestar's testimony that it understood Enis to speak on behalf of R&T. (*Id.* ¶ 26.) The Court agrees that these facts do indeed indicate that Bluestar likely believed it had entered into a contract with R&T. The Court disagrees, however, that facts showing Bluestar may have had an agreement with R&T necessarily preclude an alternative or additional agreement that Bluestar may have had with Enis, individually. The Enis Defendants also highlight Bluestar's complaint allegations, which repeatedly attribute the relevant breach-of-contract conduct to "Enis/R&T," as foreclosing Enis's individual involvement. (Compl. ¶¶ 69–71.) While the pleading is perhaps inartful, the Court is not convinced, without more, that it shows that only R&T, and not Enis, entered into an agreement with Bluestar for the purposes of summary judgment.

As to the second issue, according to the Enis Defendants, the only circumstance Bluestar could point to in support of its claim that the comfort letter was fraudulent or not valid "was the fact that Soleil is a bank registered in the Union of Comoros." (Enis Defs.' Mot. at 17.) This is wholly inaccurate. The Court finds no shortage of record evidence that shows the comfort letter could have been fraudulent, on other bases: R&T had a negative net worth of $1,234,419 as of December 31, 2019 (Pl.'s Add'l Facts ¶ 3, ECF No. 127, 11); R&T reported income losses of $341,799 and $654,892 on its 2018 and 2019 tax returns, respectively (*id.*); and Enis agreed that R&T did not "have the financial capacity to finance, on its own, a quarter-of-a-billion dollar transaction to purchase latex gloves" (Enis Dep. 45:17–22). This evidence, when read in the light most favorable to Bluestar, as the nonmoving party, could be inferred to be directly at odds with the representations in the comfort letter that R&T had, in July 2020, "cash funds and/or [a] credit line in the

amount of USD 250,000,000.00" through a purported account held by Soleil. (Compl. ¶ 14.) Accordingly, summary judgment in the Enis Defendants' favor on this issue is not warranted.

Conversely, the Court agrees that Enis and R&T are entitled to summary judgment on the issue of whether Bluestar is entitled to lost-profit damages. Bluestar's breach-of-contract claim rests on its allegations that "Enis/R&T" breached the parties' agreement in two ways: (1) failing to provide a valid comfort letter; and (2) not transferring $250 million to Soleil on Bluestar's behalf. In order to succeed in its quest for lost profits, Bluestar must submit "concrete evidence of causation." *Kaplan v. Nautilus Ins. Co.*, 861 F. App'x 798, 806 (11th Cir. 2021) (unpublished). In arguing causation, Bluestar centers its position on the resale value of the gloves, had it received them "on or around the time of the contract with Wish." (Pl.'s Resp. at 16.) As Bluestar frames it, Bluestar "would have been able to achieve millions of dollars in profits had it been able to close on the deal with Wish." (*Id.* at 17.) But Bluestar skips a step: it fails to show, "with reasonable certainty that . . . the defendant's action caused the damage." *Kaplan*, 861 F. App'x at 805 (cleaned up). That is, Bluestar must first show, with evidence that rises above just speculation, that Wish would have, indeed, sent the gloves had Enis or R&T provided a valid comfort letter and transferred $250 million to Soleil on Bluestar's behalf. Record evidence of this, however, falls far short, as explained below.

First, Bluestar, in responding to the Enis Defendants' motion for summary judgment, relies heavily on what it describes as "undisputed evidence that it was under contract with Wish to purchase $250 million of nitrile gloves." (Pl.'s Resp. at 16.) In support, Bluestar references a document titled "SALES CONTRACT," dated July 31, 2020. (Pl.'s Mot. for Summ. J., Ex. 5, Sales Contract, ECF No. 114-5.) Although not a model of clarity, that document purports to be an agreement between Bluestar and Wish, under which Bluestar agrees to purchase and Wish agrees to sell thirty million boxes of various sizes of "Nitrile Medical Grade Pow[d]er Free Disposable Examination Gloves" for $285 million. (*Id.* at 2.) According to the document, the "[d]elivery schedule" is "5 working days after receiving the balance payment." (*Id.*) The mechanism or structure of the payment is not entirely clear as the agreement says "[t]he actual contract value shall be paid by two parties according to the settlement and contract with goods quantity that is accepted, delivered and signed by the person that is authorized by two parties." (*Id.* at 5.) The delivery location is identified as Long Beach, California and requires that, "[a]fter the two parties sign the Contract"—the contract appears to be signed by representatives from both Bluestar and Wish—"[Bluestar] will transfer by wire 100% of the contract value BY CASH (TT) immediately when [Wish] provides all shipping documents,

SGS REPORTS and all necessary export documents." (*Id.* (capitalization and wording as in original).) It's not entirely clear how many units Wish agreed to ship, or when, because in one place the contract appears to require that the "first shipment has to guarantee at least 3,000,000 cartons"—the equivalent of thirty million boxes—which "will be ready to delivery in 7 days after contract takes effect and receive THE DOWN PAYMENT." (*Id.* at 6 (capitalization and wording as in original).) Elsewhere, in contrast, the agreement requires the first shipment to contain only a "minimum quantity of 20000 cartons." (*Id.*) Regardless, however, of these apparently inconsistent provisions, what *is* clear is that there is no contingency involving any of the Defendants or even a comfort letter, generally, or the transfer of funds to a bank, submitted on behalf of Bluestar. Accordingly, while this document might help support Bluestar's claim that it had an agreement to purchase the gloves from Wish, it does not show that Enis or R&T's failure to either provide a valid comfort letter or to transfer $250 million to Soleil actually caused Wish to renege on the purported deal.

Correspondingly, to the extent Bluestar looks, instead, to some other arrangement it says it had with Wish—either apart from or in addition to the written contract—the evidence on which it relies to establish that alleged transaction is also far too speculative to support a claim for lost profits. In addition, that purported transaction, itself, is incompatible with the very written contract Bluestar maintains it entered into with Wish on July 31, described above.

For example, in Hussain's affidavit, he maintains that a "condition precedent to Bluestar's agreement with Wish was that Bluestar provide Wish with a proof of funds letter to demonstrate to Wish that Bluestar had control of cash or lines of credit that would enable Bluestar to purchase $250,000,000.00 of nitrile gloves with capital under its control." (Hussain Aff. ¶ 6, ECF No. 114-1.)[1] Bluestar's reliance on this evidence is unavailing. To begin with, Hussain provides no evidentiary support for his conclusory description of what he claims was a condition precedent to Bluestar and Wish's consummation of their written agreement. Indeed, the written contract appears to indicate that any modification "or supplement" to the terms of the July 31 contract would have to be in writing in order to be given effect. (Sales Contract at 8.) Furthermore, even if there was such an agreement, regarding the condition precedent, even Bluestar does not specify anywhere in the record that the

---

[1] In their response to Bluetar's motion for summary judgment, the Enis Defendants ask the Court to disregard Hussain's affidavit. (Enis Defs.' Resp. at 13.) Any parts of the affidavit upon which the Court relied were not, ultimately, prejudicial to the Enis Defendants. The Court thus finds the request moot.

comfort letter, cash, or line of credit was uniquely tied to Enis or R&T. In other words, Bluestar fails to present any evidence that its inability to procure the comfort letter or funds from Enis or R&T, specifically, resulted in the collapse of the Wish deal as opposed to its inability to procure such a comfort letter or funds at all. Ultimately, Bluestar's "unsupported allegations" fall far short of qualifying as the type of "concrete evidence of causation" that could establish Enis or R&T's liability for Bluestar's lost profits when its deal with Wish fell apart.

Bluestar also points to Enis's deposition testimony as evidentiary support for Enis and R&T's lost-profits liability. In that testimony, Enis recounts Crooke's representation that he had a seller, a buyer, and that Crooke himself was able to finance the deal "as an experienced importer." (Enis Dep. at 21:1–2.) Enis further conveyed, in that testimony, that Crooke's "only request" was for Enis to "get a chartered US bank to provide either . . . a bank comfort letter or a letter of credit." (*Id.* at 21:3–5.) But Bluestar fails to explain how this testimony, without more, establishes that Enis's failure to fulfill Crooke's request was the event that resulted in Wish's refusing to fulfill its obligation to send the gloves to Bluestar, as required by the parties' written contract. Why couldn't Bluestar, once things went south with Enis and R&T, get a comfort letter or letter of credit elsewhere? Bluestar never says. Or, if Wish really did require the comfort letter or letter of credit from Enis or R&T, before it would go forward with the contract, then Bluestar's arrangement with Wish was indeed purely speculative at that point.[2] And such an inchoate agreement would be wholly insufficient to support a claim for lost profits. In the end, Bluestar cannot have it both ways: under the written contract it has presented, there is no contingency involving Enis or R&T; or, putting aside the written contract, Bluestar has presented nothing more than a speculative arrangement that ultimately fell through. Either way, Bluestar has failed to come forward with evidence to combat the Enis Defendants' showing that there is no genuine

---

[2] Certainly Hussain's deposition testimony seems to support the speculative nature of the arrangement with Wish. For example, when asked if the contract with Wish had ever been finalized, Hussain responded that he didn't think so. (Hussain Dep. 206:25–207:4 .) Hussain also agreed "that no executed contract exists" and that Hussain knew that Bluestar "needed to have a comfort letter" before Wish would enter into any agreement, clearly acknowledging that the parties were merely "in discussions about entering into a contract." (Hussain Dep. 210:18–20; 230:4–11.) Hussain even stated, with no equivocation, that Bluestar knew it had to first prove to Wish that Bluestar was "capable of $250 million worth of business," before Wish would even provide documentation showing that Wish actually had thirty million boxes of gloves on hand. (Hussain Dep. 259:17–260:4–10.) Furthermore, Bluestar, even in its own motion for summary judgment, concedes that '[i]n order to close on the transaction, Wish required Bluestar to produce a letter from a U.S.-chartered bank showing funds of $250 million to finance the transaction." (Pl.'s Mot. at 5.)

issue of fact regarding Bluestar's failure to show its entitlement to lost profits on its breach-of-contract claim.

In summary, then, the Court agrees that Enis and R&T are entitled to summary judgment in their favor with respect to Bluestar's claim for lost-profit damages, arising from its breach-of-contract claim. With respect to all other issues raised as to Bluestar's breach-of-contract claim, however, the Court denies the parties' cross motions for summary judgment.

### C. FDUTPA

Both Bluestar as well as Enis and R&T move for summary judgment in their respective favors on Bluestar's FDUTPA claim. Neither party's efforts hit the mark.

Bluestar, in cursory fashion, argues it should prevail on its FDUTPA claim against Enis and R&T because "Enis and R&T deliberately misrepresented their ability to finance a purchase of $250 million of nitrile gloves" and strung "Bluestar along by securing the fraudulent Soleil Letter purporting to show $250 million in liquid fund at Soleil Bank in the form of actual funds in an account or a credit line in favor of R&T," which resulted in "trick[ing] Bluestar into wiring $300,000 to the Trust in exchange for a worthless piece of paper." (Pl.'s Mot. at 18.) Bluestar's faint outline in support of its FDUPTA claim falls far short of establishing an absence of any genuine issues of material fact entitling it to judgment as a matter of law.

As the Court set forth in its order on the Defendants' motion to dismiss, "[i]n order to assert a claim for damages under FDUTPA, the plaintiff must establish: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Baptist Hosp., Inc. v. Baker*, 84 So. 3d 1200, 1204 (Fla. 1st DCA 2012) (cleaned up). As the Court further expounded, to satisfy the causation element, a plaintiff must "prove that an objectively reasonable person would have been deceived" by the deception or unfair act. *Fitzpatrick v. Gen. Mills, Inc.*, 635 F.3d 1279, 1283 (11th Cir. 2011). Bluestar fails to even mention this requirement, never mind show that the record conclusively establishes it in Bluestar's favor. Without more, then, Bluestar's motion regarding its FDUTPA claim falls short.

The Enis Defendants' motion is equally inadequate. The Enis Defendants maintain that "the undisputed evidence in this case refutes not only Bluestar's allegations that Enis and R&T engaged in fraudulent acts, but also any suggestion that an objectively reasonabl[e] person would have been deceived."[3]

---

[3] Although neither party raises the issue, the Court notes that FDUTPA claims are not limited to suits against corporate entities alone. Indeed, "it has long been the law in Florida that in

(Enis Defs.' Mot. at 21.) In support of their argument, the Enis Defendants point out that "Enis never told Bluestar that he was going to transfer cash into an account at Soleil" and that Enis made it "clear" "that R&T was obtaining a [comfort letter] to confirm that funds could be made available in the form of cash or credit line." (*Id.*) As for the letter itself, the Enis Defendants say that, because Bluestar received a draft of it, before paying for it, Bluestar cannot claim to have been deceived. Additionally, say the Enis Defendants, Bluestar's own recognition that Soleil's registration in Comoros should have been a red flag, shows that it was not objectively reasonable for Bluestar to have been deceived. (*Id.*) The Court is not persuaded.

To be sure, there appears to be no real dispute that Enis, either on his own or through R&T, caused Bluestar to part with $300,000 in exchange for the comfort letter. And, as set forth above, in section 3.B., Bluestar has presented evidence that, when read in the light most favorable to it, shows that the comfort letter could have, indeed, been fraudulent: not long before the letter was issued, R&T had a negative net worth of over $1 million; R&T had reported income losses between $300 and $700 thousand on its two prior tax returns; and Enis testified that R&T did not have the financial capacity to finance, on its own, a quarter-of-a-billion-dollar transaction to purchase latex gloves. Nor is the Enis Defendants' reliance on Hussain's testimony, acknowledging that Soleil's registration in Comoros should have been a "red flag," enough to entitle them to summary judgment. Without more, the Enis Defendants fail to connect the dots between something Bluestar recognizes, in hindsight, as a red flag, on the one hand, and a showing that, based on this one red flag, it was not probable that an objectively reasonable person would have been deceived, on the other. Instead, in order to prevail, on summary judgment, the Enis Defendants would have to show that all of the information known or reasonably available to Bluestar, in the context of the transactions at issue, would have prevented a reasonable consumer from being deceived. *See Piescik v. CVS Pharm., Inc.*, 576 F. Supp. 3d 1125, 1132 (S.D. Fla. 2021) (Middlebrooks, J.) (recognizing that courts "should take into account all the information available to consumers and the context in which that information is provided and used" in evaluating FDUTPA claims). In short, the Enis

---

order to proceed against an individual," as opposed to a corporate entity, for a FDUTPA violation, an aggrieved party must only allege facts showing that "the individual was a direct participant in the improper [corporate] dealings." *KC Leisure, Inc. v. Haber*, 972 So. 2d 1069, 1074 (Fla. 5th DCA 2008). In other words, under FDUTPA, it is unnecessary to pierce the corporate veil where an individual defendant was, as alleged here, a direct participant in the complained of dealings. *Id.* (citing *Rollins, Inc. v. Heller*, 454 So. 2d 580, 582 (Fla. 3d DCA 1984)).

Defendants also come up short in establishing their entitlement to summary judgment.[4]

### D. Civil Theft

The Enis Defendants and Bluestar also both claim entitlement to summary judgment in their respective favors on Bluestar's civil-theft claim against the Trust. The Enis Defendants argue Bluestar cannot prevail on its claim for civil theft for two main reasons: Bluestar has not set forth any evidence showing that (1) it expected the Trust to hold the $300,000 transfer for Bluestar's benefit; or (2) that the Trust acted with felonious intent to commit theft. (Enis Defs.' Mot. at 14–15.) Conversely, Bluestar maintains that, based on the record, no reasonable jury could possibly return a verdict in favor of the Trust. (Pl.'s Mot. at 12–13.) Once again, the Court does not find Bluestar's perfunctory presentation convincing: not only does it fail to affirmatively establish the absence of any genuine issue of material fact as to all the elements of its civil theft, but it fails to come forward with any evidence at all that it had an immediate right to possess all the funds at the time of the alleged civil theft. Conversely, the Court agrees with Enis that the record—including, importantly, Bluestar's own testimony—establishes that Bluestar has not identified evidence showing that it had an immediate right to possess the $300,000 payment to the Trust.

"Under Florida law, a plaintiff in an action for conversion or civil theft must establish," among other elements, "possession or an immediate right to possession of the converted property at the time of the conversion." *U.S. v. Bailey*, 419 F.3d 1208, 1212 (11th Cir. 2005). In its complaint, Bluestar says it was induced into wiring $300,000 to the Trust as "the purported cost of transferring $250,000,000.00 to Soleil." (Compl. ¶ 42.) In briefing, testimony, and its statement of facts, Bluestar recharacterizes the $300,000 as representing its share of the total cost of getting the comfort letter from Soleil. (*E.g.*, Pl.'s Mot. ¶ 32 ("[Enis] required that Bluestar wire $300,000 to the Trust as payment for the 'fee' for the issuance of the fraudulent bank comfort letter."); Pl.'s Stmt. of Facts ¶ 41 ("Enis represented to Bluestar that he had already remitted $625,000 to Soleil Bank for issuance of the Soleil Letter and

---

[4] Although Bluestar does not seek lost profits on its FDUTPA claim in its complaint, it appears to claim entitlement to them in its motion for summary judgment. (Pl.'s Mot. at 18.) Aside from lacking record support for its entitlement to lost profits, such damages, in any event, are not recoverable under FDUTPA. *Diversified Mgt. Sols., Inc. v. Control Sys. Research, Inc.*, 15-81062-CIV, 2016 WL 4256916, at *5 (S.D. Fla. May 16, 2016) (Middlebrooks, J.) (recognizing that lost profits, as a "quintessential example of consequential damages," are not recoverable under FDUTPA). Accordingly, the Court grants summary judgment in Enis and R&T's favors with respect to any claim Bluestar intended to seek to lost profits on its FDUTPA claim.

requested a remittance of $300,000 to the Trust as payment of approximately half of the free."); Hussain Aff. ¶ 16 ("Enis request[ed] remittance of $300,000 to pay for partial payment of the $625,000 fee Soleil Chartered Bank charged for the letter and for reserving against Mr. Enis' funds."). Bluestar further elaborated that Enis relayed that "he had already paid $625,000 to Soleil Chartered Bank and instructed [Bluestar] to reimburse him for half of the fee by wiring $300,000 to his family trust." (Hussain Aff. ¶ 16.) Regardless, though, of what Bluestar really thought the fee was for or what Enis actually told them it was for, there is not a single allegation indicating that Bluestar transferred the funds to the Trust to hold in escrow or to hold for a particular purpose. While there are certainly facts presented from which a jury might infer that the Defendants, or a subset thereof, wrongfully induced Bluestar to part with its $300,000, Bluestar's entitlement to those funds is yet to be determined. In other words, not a single fact has been adduced to show that at the time of the purported theft, or conversion, that Bluestar had an *immediate* right to possession of the $300,000.

Accordingly, the Court grants summary judgment in favor of the Trust on Bluestar's claim for civil theft.

### E. Unjust Enrichment

The parties next cross claim for summary judgment on Bluestar's unjust-enrichment claim against the Trust. The Enis Defendants maintain the Trust should be granted summary judgment on this count because (1) the Trust did not actually "retain" those funds and (2) Bluestar actually received "the exact benefit it was expecting in exchange for the $300,000.00 it wired to the Trust." (Enis Defs.' Mot. at 15.)[5] In its motion, in contrast, Bluestar maintains that the "record incontrovertibly demonstrates that Enis'[s] actions as settlor of the Trust resulted in the Trust's unjust enrichment." (Pl.'s Mot. at 14.) Both motions miss the mark.

"A claim for unjust enrichment under Florida law requires showing that: (1) plaintiff has conferred a benefit on defendant; (2) defendant voluntarily

---

[5] The Enis Defendants also argue that Bluestar's equitable claim for unjust enrichment fails because Bluestar has adequate legal remedies at its disposal, to collect on the $300,000. First, this is a misapplication of the law: a correlation between the injury and damages sought is not the point. Rather, it is the wrongful conduct, underlying under the claims that should be compared. *See, e.g.*, *Nelson v. Mead Johnson Nutrition Co.*, 09-CV-61625, 2010 WL 11457652, at *6 (S.D. Fla. Mar. 9, 2010) (Cohn, J.) (recognizing that the plaintiff's unjust-enrichment claim was not available because it sought "recovery for the *exact same wrongful conduct*" as in her other claims) (emphasis added). Further, the Court already addressed this issue in ruling on the Defendants' motion to dismiss and, without more, it is too late for them to seek reconsideration of that decision now.

accepted and retained that benefit; and (3) the circumstances are such that it would be inequitable for defendant to retain it without paying the value thereof." *OJ Commerce, LLC v. Ashley Furniture Indus., Inc.*, 817 F. App'x 686, 692 (11th Cir. 2020). Once again, for the same reasons as set forth in the sections above, regarding Bluestar's attempt to have summary judgment entered in its favor on its FDUTPA and civil-theft claims, Bluestar's motion is bereft of support. While it indeed appears there is no dispute that Bluestar transferred $300,000 to the Trust, Bluestar fails to show that the record conclusively establishes—at least for the purposes of summary judgment—that the Trust retained all of the transfer for its own benefit or that it would be inequitable for the Trust to retain any portion of the fee. Even Bluestar acknowledges that the Trust sent at least $250,000 of the funds to Soleil. (Pl.'s Stmt. of Facts ¶ 43.) And Enis says he sent the $250,000 on to Soleil, on Bluestar's behalf. (Enis Dep. at 25:9–18.) While the parties do not appear to dispute that the Trust retained the remaining $50,000, the Court is nonetheless unable to deduce, at least from Bluestar's briefing, that, for the purposes of summary judgment, it would be inequitable for the Trust to retain that amount.

At the same time, the Enis Defendants' motion also falls short. Simply because the Trust transferred $250,000 of the $300,000 to Soleil doesn't mean it didn't "retain" the funds for its own use. "Retain" in this context simply means that the defendant used the funds for its own benefit—not that it retained them in perpetuity. And, because there is evidence in the record, as set forth in the previous sections, from which a jury could infer that Enis knew Soleil was not legitimately entitled to the $250,000 "fee," the Trust is unable to show that it was equitable for it to retain the funds. This is even more so for the $50,000 that the Trust does not dispute retaining.

Accordingly, the Court denies both motions for summary judgment regarding Bluestar's unjust enrichment claims.

**F. Fraudulent Misrepresentation**

Next, both Bluestar, on the one hand, and Srivastava and Abbas, on the other, seek summary judgment in their respective favors on Bluestar's claim for fraudulent misrepresentation. As a starting point, Srivastava and Abbas's motion is wholly inadequate: (1) they failed to file, on the docket, an accompanying statement of material facts, as required by Local Rule 56.1, when they submitted their motion for summary judgment; (2) in their motion, instead of seeking summary judgment, they instead submit that Bluestar's claims should be "dismissed"; and (3) their motion is virtually devoid of any substance or cohesive argument that would entitle them to summary judgment

on Bluestar's fraudulent-misrepresentation claim. For these reasons, the Court denies their motion in its entirety. Bluestar, on the other hand, argues that it is entitled to summary judgment, in its favor, because, among other reasons, the comfort letter, signed by both Srivastava and Abbas, "was undeniably false." (Pl.'s Mot. at 10.) While there is evidence from which a fact finder could infer the letter presented a false statement, there is also evidence, when read in the light most favorable to Srivastava and Abbas, that could lead to the conclusion that it was not necessarily false or, even if it was, Bluestar has not shown that the record establishes Srivastava and Abbas knew of the falsity.

"[T]here are four elements of fraudulent misrepresentation: (1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in *reliance* on the representation." *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010) (emphasis in original). The relevant statement, at the center of Bluestar's claim, was presented in the July 28, 2020, letter in which Srivastava and Abbas aver that Soleil Bank's "client account name R & T Pharmacy Corp" had "cash funds and/or credit line in the amount of USD 250,000,000.00." (ECF No. 1-3.) Bluestar maintains this was demonstrably false because (1) neither Enis nor R&T ever deposited any funds into an account at Soleil Bank prior to July 28, 2020; (2) R&T suffered an operating loss of $660,053 in 2019 and had a negative net worth as of December 31, 2019; (3) R&T was incapable of financing a transaction of $250 million; and (4) Soleil Bank never had control of $250,000,000 such that it could back a credit line in that amount in favor of R&T. (Pl.'s Mot. at 10–11.) Bluestar also submits that Srivastava and Abbas's knowledge that their representation was false has been established because they "knew" that R&T did not have $250 million in funds because R&T had never deposited any funds in Soleil Bank. (*Id.* at 11.) The Court finds Bluestar misses the mark on a few fronts.

First, reading the facts in the light most favorable to Srivastava and Abbas, the Court is not convinced Bluestar has established an absence of any genuine issues as to a material fact regarding the falsity of the statement. Left out of Bluestar's presentation is Srivastava and Abbas's contention that the "credit line" referred to in the comfort letter is based on the value of the collateral involved in the transaction—the purported $250 million worth of nitrile gloves. (Srivastava and Abbas's Resp. Stmt. ¶ 37.) As Srivastava testified, in general, Soleil Bank's issuance of a "proof of fund letter . . . will depend on the transaction collateral." (Srivastava Dep. 53:2–4, ECF No 114-21.) Referring to the comfort letter here, specifically, Srivastava also said that the reference to "credit line" in the letter "depends on the collateral." (*Id.* at 59:18–20.)

Srivastava repeated the point, emphatically, insisting that "the credit line is based on the collateral of the transaction," elaborating that there "can be so many ways of doing the transaction." (*Id.* at 85:9–10, 18–19.) Abbas testified similarly, for example, explaining that, "[i]n transactions normally the product is the collateral," referring specifically, as relates to the purported transaction in this case, to the gloves. (Abbas Dep. at 28:13–20, 30:7–8, ECF No. 114-3 ("Like I said, the gloves are the collateral."), 32:4 – 5 ("[T]he product is the collateral in these deals.")). While Srivastava and Abbas's explanations may ultimately fail to impress a jury, by not addressing this ambiguity—or even mentioning it—Bluestar leaves the Court unable to conclude, as Bluestar urges, that there is insufficient evidence in the record upon which a reasonable juror could find in Srivastava and Abbas's favor.

Further, even if the record did establish the falsity of the statement, for the purposes of summary judgment, Bluestar falls short of showing that Srivastava and Abbas knew that the statement was false. Bluestar concludes Srivastava and Abbas were aware of the letter's falsity because they "knew their representation that R&T has $250 million in funds was false because R&T had never deposited any funds in Soleil Bank." (Pl.'s Mot. at 11.) Among other infirmities, however, Bluestar's premise is flawed – the letter says only that R&T has "cash funds and/*or* credit line [*sic*] in the amount of USD 250,000,000.00" (emphasis added); the letter doesn't affirmatively say that R&T actually has $250 million in cash. Because Bluestar neglects to address the disjunctive aspect of the statement, it leaves open the possibility that Srivastava and Abbas believed that R&T's purported credit line was valid, thus demonstrating a lack of knowledge. This too dooms Bluestar's efforts to have summary judgment entered in its favor on this count.

### G. Civil Conspiracy

All three parties, or groups of parties, seek summary judgment in their favors on Bluestar's civil conspiracy count. As a starting point, because Bluestar has not established summary judgment in its favor on any of the underlying tort counts, it cannot, therefore, establish summary judgment in its favor on its civil conspiracy claim. The flipside to this, of course, is that, to the extent the Defendants' motions seek summary judgment in their favor because Bluestar has failed to establish any of the underlying tort counts against them, their motions similarly fail: liability as to the underlying torts will be decided through trying this case in front of a jury. Additionally, however, the Enis Defendants seek summary judgment in their favor on this count for other reasons, arguing that Bluestar "wholly fails to show that Enis, R&T, or the Trust reached any sort of agreement with Soleil, or anyone else for that matter,

to engage in unlawful acts." (Enis Defs.' Mot. at 19.) The Court is not convinced.

In support of their motion, the Enis Defendants rely on Hussain's deposition testimony where he says he does not have any evidence that, for example, either R&T or the Trust entered into an agreement with Soleil to defraud Bluestar. (Hussain Dep. 256:1–12.) They also point to Hussain's admitting that, other than the fact of Soleil's registration in Comoros, Bluestar does not have any evidence that Enis and Soleil entered into an agreement or "secret deal" to defraud Bluestar either. (Hussain Dep. 254:19–255:25.) According to the Enis Defendants, "[t]hese admissions—paired with the mere conclusory suggestion that the Defendants should have known that Soleil was purportedly a fraudulent bank—based solely on the fact that Soleil was 'registered in Comoros'—are insufficient to establish the existence of a genuine fact for trial." (Enis Defs.' Mot. at 19–20.) The Court finds the analysis, as far it goes, flawed.

First, the testimony they highlight says nothing about any agreement any of the Enis Defendants might have had with Srivastava or Abbas or among each other. Additionally, the record is chock full of facts that, when read in the light most favorable to Bluestar, circumstantially support agreements between each of the Enis Defendants and others in the case. *See Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 950 (11th Cir. 1997) (recognizing that a civil-conspiracy "agreement need not be established by direct evidence," but "may be inferred from the conduct of the participants"). As set forth above, the record contains evidence from which a jury could find (1) the comfort letter was fraudulent (see sections 3.B., C., and F.); (2) that Enis and R&T arranged with Abbas to procure the comfort letter; (3) Abbas and Srivastava signed the letter; (4) Enis had Bluestar wire $300,000 to the Trust, for procuring the comfort letter; and (5) Enis then sent $250,000 of that to a bank account associated with Abbas or Srivastava or a company connected to them. This is enough circumstantial evidence, when read in the light most favorable to Bluestar, to foreclose summary judgment in the Enis Defendants' favor based on their argument that there is no evidence establishing an agreement to do an unlawful act.

### 4. Conclusion

For the reasons set forth above, the Court **denies** Bluestar and Srivastava and Abbas's motions for summary judgment in their entireties (**ECF Nos 112, 115**) and **grants in part and denies in part** the Enis Defendants' motion (**ECF No. 118**). The Court grants summary judgment in the Enis Defendants' favor with respect to only the following: Bluestar's claim for civil

theft against the Trust; Enis's alter-ego liability for the debts of R&T; and Bluestar's claims for lost profits. The Court denies the Enis Defendants' motion in all other respects. Because the Court denies Srivastava and Abbas's motion for summary judgment in its entirety, it **denies as moot** Bluestar's motions to strike both their motion and their untimely statement of facts (**ECF Nos. 120**, **131**). To the extent Bluestar still seeks sanctions and its fees, associated with these motions, it can refile a separate motion, in compliance with the Federal and Local Rules, seeking that relief.

By way of a summary, the following claims remain for determination through trial:[6]

| Count | Defendant |
|---|---|
| One: Fraudulent misrepresentation | Srivastava and Abbas |
| Seven: Unjust enrichment | The Trust |
| Eight: Breach of Contract | Enis and R&T |
| Eleven: Civil conspiracy | Enis, R&T, the Trust, Srivastava, and Abbas |
| Sixteen: FDUTPA | Enis, and R&T |

**Done and ordered**, at Miami, Florida, on September 22, 2022.

Robert N. Scola, Jr.
United States District Judge

---

[6] As explained above, a clerk's default was entered against Soleil Bank regarding the claims remaining against it: fraudulent misrepresentation; negligent misrepresentation; civil conspiracy; negligent retention; FDUTPA; and false information negligently supplied. (ECF No. 154.)